## Lutes v. Commonwealth.

(Decided December 16, 1930.)

ROSE & STAMPER, C. E. TYREE and J. F. SUTTON for appellant.

J. W. CAMMACK, Attorney General, and HOWARD BLACK for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

At its regular session in 1916 the General Assembly of Kentucky enacted chapter 49 of the Acts of that session, which chapter has passed into the Ky. Stats., and appears as sections 1215b-1 to 1215b-3. The subject dealt with is commercialized vice in relation to prostitution. The section defining the offense of pandering is the first one mentioned above, and it is divided into a number of paragraphs or clauses each defining particular acts which amount to pandering. The major portion of the section deals with procuring a female for a house of prostitution, and in one phase or another the definition includes a person who procures a female for that purpose, or one who induces, persuades, or encourages a female to either become or remain an inmate of such a house, or one who aids, encourages, or assists in bringing a female from another state into this state for the purposes of prostitution. The section deals with commercialized vice in connection with houses of prostitution and the acts of persons in obtaining women for such places until the close of the section, or what may be called the last definition of pandering. That is included under the designation "(g)" which is to the effect that one who shall procure for another a person for the purpose of illicit sexual intercourse, and shall directly or indirectly receive therefor a consideration, shall be guilty of pandering.

Millard Lutes, the appellant, lived near the family of Callie Stamper, the chief prosecuting witness, in Lee county. Custer Cornett lived in the same neighborhood. Other persons who took part in the incidents on which this prosecution was based resided in the neighborhood. Lutes was a married man residing with his wife. Cornett presumably was married, as he resided with a woman accepted as his wife, and they had one child. Callie Stamper resided at the home of her parents and was one of several children.

On a day Callie Stamper testified that she saw the appellant on the road leading from her home to a store

and he inquired of her "if she was going." When this conversation took place between them, according to her testimony, he said to her, "Are you going?" She replied "What do you mean by going?" He responded "You needn't care to tell me Custer has already got me to take you all off." She retorted, "I don't know what you mean. I am not going." He responded "If I was you I would go." She inquired, "Why is that Millard?" And he answered, "Your father and mother is meaner to you than they are any of the rest of the children and if you go with him you will have anything you want pretty to wear and be treated well." She said, "But why I can't get away from home." His answer to that was: "Tell them you are going to the store and if I don't meet you at the falls, Custer or somebody else will."

This conversation on the road, according to her evidence, occurred a few days before she took her flight with Custer Cornett. She testified that on the Sunday following the conversation she went to the home of appellant to borrow some household necessities in connection with her preparing a meal when he said to her, "Be ready."

A day or two later a brother and a friend or two of Custer Cornett went with him to a point on the river, and his brother appears to have gone to the home of Callie Stamper, or in some way notified her that Cornett was waiting at the river side. They went down the river some miles in a boat, Custer and his friends occupying a boat with the girl and having with them at least one shotgun and probably one or more pistols. Arriving at a point on the river nearest to Cable schoolhouse, they disembarked and one of the party climbed the hill to reconnoiter, and, upon a report that the way was open, those at the river proceeded on their way. Near the Cable schoolhouse appellant and his wife were in an automobile owned by appellant and used by him from time to time to haul passengers for hire. When Custer and Callie arrived at the automobile they climbed into the back seat. Custer gave appellant a pint of whisky and requested him to drive. The first stop, except to stop now and then to obtain gasoline, was made at Winchester, where appellant and his wife, with money furnished by Custer Cornett, purchased a dress for the girl. The journey was again taken up and ended in Covington. When they parted in Covington Custer asked the appellant if the whisky which he got on election day and the

pint which he had given him at the time of starting and $1 would be sufficient to pay him for bringing them to Covington. Appellant accepted it as sufficient compensation and returned with his wife to his home in the hills of Lee county.

The foregoing contains the substance of the evidence as detailed by Callie Stamper. She did not testify at any time that she went with Custer Cornett because Lutes requested her to do so, and she does not claim that what he said to her had any influence on her in making up her mind. At least two other persons carried word to her from Custer Cornett, according to her statement. She was eighteen years of age and Cornett appears to have done his wooing through intermediaries. She did not testify that she knew where she was going, or what was going to happen when she consented to go with Cornett. What the other emissaries of Cornett had said to her is not disclosed by her.

Appellant testified in his own behalf that he had never had a conversation with Callie Stamper in his life, and he denied that he had the conversation with her on the road as detailed by her, or that he saw her on Sunday at his home. He is corroborated so far as the Sunday meeting was concerned. His statement on the witness stand was that Cornett had approached him with the request that he take him to the Cornett old home in Wolfe county, and, although not a licensed operator of an automobile for hire, he had been engaged in hauling passengers for hire. Cornett had requested him, so he claimed, to meet him at the Cable schoolhouse, as that was to be the starting point on the trip to Wolfe county. He had his wife with him, as she had a sister who lived on the way and desired to visit her sister. When he left the forks of the road and was preparing to head towards Campton in Wolfe county, Cornett told him that he had changed his mind and wanted to proceed the other way, and he then drove him over the road to Covington. When he reached Covington Cornett asked him how much he charged and he told him $10, and he was paid that sum by Cornett and returned to his home. He stated that he did not know that Callie Stamper was to go with Cornett, and when she appeared with him at the automobile he protested against taking her, but Cornett without regard to his objections opened the door of the automobile and helped Callie in.

The statute under which the prosecution is conducted, not only requires that the defendant shall procure for another a person for the purpose of illicit sexual intercourse, but it further requires that he shall directly, or indirectly, receive therefor a consideration.

Two questions are thus presented by this record. The first is whether Lutes procured Callie Stamper for Custer Cornett, and, if it should be held that he did so, the next question is whether he received a consideration therefor either directly or indirectly. The word "pander" has been defined by some of the courts, but it is unnecessary for us to go into what is meant by the word, as our statute defines what the General Assembly had in mind. We are concerned with what is meant by the word "procure" as used in the statute. The word ordinarily means to acquire, or to bring into possession, or to get, or to gain, or to obtain, or to secure, or to bring about, or to cause, or to cause a thing to be done, or to contrive, or to endeavor to bring about, or to induce or to induce to do something. It may mean to solicit. Ordinarily in criminal parlance, when the word is used in such statute as ours, it means to bring about, to effect, to cause, and it may be used as being synonymous with abet, aid, find, introduce, and probably there are other synonymous words. A procurer has been defined as one who procures for another the gratification for his lusts. He is a panderer who solicits trade for a prostitute, or lewd woman. These definitions are taken from 50 C. J. 626 et seq.

From a consideration of these definitions it appears that one may procure a person for another if he aids, abets, persuades, or induces such person to pass into the possession of the one desiring to have illicit sexual intercourse with such person. But there is no evidence here that appellant's persuasions, inducements, or suggestions were the efficient or moving cause that resulted in Callie Stamper's going with Custer Cornett on the trip which led to Detroit where they lived together for some months. She did not testify that his suggestion that she go with Cornett had any effect whatever on her. So far as this record discloses she learned from several persons that Cornett was willing to take her away, and there is nothing to indicate that she made up her mind to go because of any inducement held out by the persons who conveyed the information to her. If it should have been shown that

the cause of her going was what was done by appellant, a different question would be presented.

Having reached the conclusion that the evidence does not show that appellant procured Callie Stamper for Custer Cornett for the purposes mentioned in the statute, it is unnecessary to determine whether the payment to him was compensation, either directly or indirectly, for procuring her.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting

Chief Justice Thomas dissents.